[Crim. No. 1058.    Second Appellate District, Division One.—May 8, 1924.]

# THE PEOPLE, Respondent, v. LOUIS COSTA, Appellant.

[1] CRIMINAL LAW — MURDER — EVIDENCE — DYING DECLARATIONS — RIGHT OF DEFENDANT TO PROVE.—In a prosecution for the killing of a human being, the defendant has the right to show the dying declarations of the deceased.

[2] ID.—DYING DECLARATION—ENDEAVOR OF DEFENDANT TO PROVE—INFERENCE.—In such a prosecution, the fact that the defendant was endeavoring to elicit evidence consisting of a dying declaration by the deceased would naturally lead to the inference that such evidence was favorable to him.

[3] ID.—EVIDENCE—DYING DECLARATION—OBJECTION TO QUESTION—INSUFFICIENCY OF OBJECTION.—In such prosecution, where the only objection to the question asked by defendant of a witness called on his behalf, "Did you hear the deceased make any statement at that time there, to anyone there, to show that the deceased knew he was dying?" was that no proper foundation had been laid for the question, the question asked was not such a question as would require the laying of any foundation before the witness could answer it, the evident purpose of asking such question being to elicit an answer which would serve as the foundation for the introduction of the dying declaration of the deceased.

[4] ID.—DYING DECLARATION—DENIAL TO DEFENDANT OF RIGHT TO SHOW STATEMENT—PREJUDICIAL ERROR.—In such prosecution, there having been before the trial court evidence of the statements made by the deceased, immediately after being shot, which tended to show that he realized he was mortally wounded, the action of the trial court in denying the defendant the right to show the further statement from deceased indicating that he still held to that belief while at the receiving hospital, if such statement was made, was prejudicially erroneous.

[5] ID.—RULING UPON OBJECTION—BY WHAT SHOULD BE GOVERNED.—In such prosecution, the ruling of the trial court upon certain objections to questions asked by defendant for the purpose of showing that the deceased made a dying declaration should be

1.  Admissibility of dying declaration on behalf of defendant, note, Ann. Cas. 1918C, 425.  See, also, 13 Cal. Jur. 727.

2.  Admissibility, as dying declaration, of statement respecting provocation, for defendant's act, note, Ann. Cas. 1912C, 429.

3.  See 13 Cal. Jur. 721.

4.  See 13 Cal. Jur. 721; 1 R. C. L. 538; 2 Cal. Jur. 1023; 2 R. C. L. 253.

governed entirely by the nature of the questions asked, their relation to the facts in the case then on trial, and the form of the objection, and not upon what the witnesses may have testified to or stated on some previous occasion.

[6] ID.—REFUSAL TO GIVE PROPOSED INSTRUCTIONS—ABSENCE OF ERROR. In such prosecution, the trial court did not err in refusing to give certain instructions proposed by defendant, as the subjects thereof were adequately covered by other instructions given.

---

(1) 30 C. J., p. 252, sec. 493.   (2) 30 C. J., p. 262, sec. 503. (3) 30 C. J., p. 262, sec. 503 (1926 Anno.).   (4) 30 C. J., p. 444, sec. 709 (1926 Anno.).   (5) 30 C. J., p. 262, sec. 503.   (6) 30 C. J., p. 336, sec. 589.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Carlos S. Hardy, Judge. Reversed.

The facts are stated in the opinion of the court.

John Hyland and Byron M. Marble for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

CURTIS, J.—Defendant was charged with the crime of murder. He was found guilty of manslaughter and now appeals from a judgment of conviction and from an order denying his motion for a new trial. The grounds advanced for a reversal of the judgment are two: First, errors of the court in sustaining objections to questions asked on behalf of the defendant for the purpose of proving certain dying declarations of the deceased; second, errors of the court in refusing to give certain instructions offered on behalf of the defendant.

Defendant killed the deceased, Edward Farmer, on Monday evening, September 17, 1923, in the city of Los Angeles. On Saturday, immediately preceding this evening, there had been some controversy between the two, at which time the deceased said to the defendant, "I am going to get you, or you are going to get me." Whereupon, according to the testimony of the defendant he walked away from

---

6. See 2 R. C. L. 1026; 2 R. C. L. 261.

the deceased to avoid trouble. Defendant and the deceased were both members of the order of Eagles, and it was in the Eagles' clubrooms in that city where the above-mentioned controversy took place. The defendant further testified that on the night of the homicide he attended a meeting at the clubrooms of the degree team of the order of which he was a member; that on this evening he took with him his pistol, a twenty-five automatic, fearing that he might have trouble with the deceased. He went to the clubrooms and remained there until a little after 10 o'clock, when he decided to go home. He walked out of the clubhouse on to Sixteenth Street, being the street on which the clubhouse faced, and then went towards Georgia Street, which is the next street west of the clubhouse, running at right angles with Sixteenth Street. Defendant then walked west on Sixteenth Street, and was attacked by deceased in the following manner: "Well, the first thing I was startled with, why, was a blow on the back of the neck. So I turned around real quick and recognized that it was Farmer. Then I ran around an automobile that was parked on the curb, and I told him, I says, 'Now, leave me alone.' I says, 'I don't want to have any trouble with you.' I says, 'Let us settle this at the meeting next Thursday night.' And he says, 'No, you won't.' He says, 'I am going to settle it right now, you dirty bastard.' After he hit me my hat fell off. . . . I picked up my hat and he grabbed me. So I broke away from him, and just as I broke away from him he reached for his hip pocket with his right hand. As he done that I pulled my gun out of my pocket. I had it in my coat pocket. And he was on top of me, and he had his—put his right hand around my neck and with his left hand he grabbed my arm, and I kept it away, just like that, kept it away from him, between him and I. And he says to me, he says, 'Put that gun up, you son of a bitch,' and I says, 'I will, if you leave me alone.' And then I noticed his right hand shift again to his hip pocket and his left hand, he grabbed me by the throat and tried to choke me, and as he done that, why, I started to shoot. I was so excited I didn't remember how many shots I fired. After he dropped, he said, 'Well, Lou,' he said, 'you got me.' So I put my hat back on my head and walked down

67 Cal. App.—12

to the club, and I met Johnnie Bouett on the steps, and I handed him the gun and I told him to call the officers.''

There was no direct contradiction of this story of the defendant. An eye-witness to the tragedy, Walter J. Higgins, on behalf of the prosecution, testified as follows: ''As I turned around I saw two men fighting in the middle of the block on the sidewalk. Q. On what side of the sidewalk? A. On the north side, the same side I was on. Q. Just a moment. Were they between you and Georgia Street or between you and Figueroa? A. Between me and Georgia Street, and I started up that way to catch my car at Georgia, and I seen one of these men—there was a few blows passed and one of these men run out in the street and around a Ford coupe that was standing there and back on the sidewalk and run west on Sixteenth Street towards Georgia and this other man run after him and caught him right in front of a printing shop there, about 200 feet from the corner of Georgia, on the north side of Sixteenth Street, and my car was just coming up towards Georgia then, and I went up to catch my car. I was just about a distance of five feet, standing there watching them fighting, and this one man had his arm around the other one's neck and they were fighting, and this other man had a gun in his right hand and he was holding it out away—holding it straight out; and so just about then the car was pretty close by there, and this man that got shot says, 'Put that gun away, you son of a bitch.' And this other fellow says, 'Turn me loose and I will.' Just about then he started shooting.'' This witness further testified that after the shooting, the defendant ''picked up his hat, put it on his head, and put his gun in his pocket and started walking down the street''; that he, the witness, walked over to Farmer and the latter said to him, ''For Christ's sake help me out, I am bleeding to death. Christ, don't let me lay here this way.'' On cross-examination, this witness testified that Farmer on this occasion said, ''For Christ's sake come over and help me out. I am shot; he got me that time. Get an ambulance, I am bleeding to death; he done a good job that time.'' Another witness for the prosecution, T. L. Miller, stated that he went over to Farmer immediately after the shooting and asked him what was the trouble, and in reply Farmer said

he wanted an ambulance and wanted help, that he was bleeding to death. Farmer was immediately taken to the receiving hospital, where he died about 10 o'clock the next morning.

Paul J. Braud, a witness called on behalf of the defendant, testified that he saw Farmer, the deceased, at the receiving hospital at the time he was shot, after which the following proceedings were had: "Did you hear the deceased make any statement at that time there, to anyone there, to show that the deceased knew he was dying? Mr. McCartney (deputy district attorney): Now just a moment, I object to that as no proper foundation laid, and I know the testimony that this witness is called here to give, and I will show it to the court, and I submit that it is not material and it calls for a conclusion. The Court: All right, hand it up. Mr. McCartney: On page 21 (showing same to court) on the ground that that statement even if the proper foundation was laid, your honor, is an opinion and conclusion of the person giving it." In the meantime, counsel presented to the court what appears from the evidence to have been a transcript of the testimony of the witness Braud, taken at the preliminary examination. The court examined this document and thereupon stated: "Well, the testimony given here by this witness shows clearly that no sufficient foundation was laid for the testimony that was sought, and the testimony on pages 22 and 23 of a similar nature to that in line 16 on page 21 is incompetent. The objection will be sustained as far as that testimony is concerned." Following this statement of the court a colloquy ensued between the court and counsel for the defendant, at the close of which the court made the following ruling: "There is no proper foundation for the statement in the first instance, and in the second instance it is a mere conclusion." No further effort was thereafter made by appellant to interrogate this witness.

Two other witnesses, nurses employed at the receiving hospital, were thereafter sworn on behalf of defendant and interrogated for the purpose of showing that the deceased made a dying declaration. The proceedings of the court while these two witnesses were under examination were similar to those which we have just recited as taking place while the witness Braud was on the stand. One of these

witnesses was asked by defendant's counsel whether, from the best of his recollection, the deceased made any statement. He replied to this question, "From the best of my recollection, I think he made a statement." The examination then proceeded as follows: "Q. What was that statement? Mr. McCartney: I object to that as no proper foundation laid. I'll show the court a statement here and I'll submit it as a conclusion which the witness couldn't come in and testify to it." (Showing transcript to court.) "The Court: Statements here made on page 31 of this transcript handed to the court, which purports to show the testimony of this witness, in which this witness purports to give a statement of what the deceased said, is clearly incompetent, and the objection to it being made here is sustained."

[1] That the defendant had the right to show the dying declarations of the deceased, if any such were made, by the deceased, we do not understand is questioned by the respondent; that such testimony is admissible on the part of the defendant, is the established rule in this state. (*People* v. *Southern*, 120 Cal. 645 [53 Pac. 214]; *People* v. *Lee*, 13 Cal. App. 48 [108 Pac. 738].) Wharton also lays down the rule as follows: "Dying declarations are admissible in favor of, as well as against, the accused, . . . and a declaration in favor of the accused must ever be taken to be more likely to be true, as it is not probable that a person should make a statement favorable to the person who has inflicted a mortal injury upon him, but rather the contrary. (Wharton on Criminal Evidence, vol. 1, p. 587.) On the same page of this volume we find the further statement that "It is also said that the rules of evidence ought not to be so rigorously applied when the fact satisfactorily appears that they favor the accused, as where they are urged against him." [2] The declarations of the deceased, if any were made by him, are not in the record, but the fact that the defendant was endeavoring to elicit this evidence would naturally lead to the inference that it was favorable to him. We are assuming, therefore, that had the declaration been proven, that they would have been in favor of the defendant.

[3] Referring back to the proceedings at the trial while the witness Braud was on the stand, we think it sufficiently appears therefrom that the only objection inter-

posed to the question asked this witness was that no foundation had been laid for the answer to such question. After the prosecuting officer had made this objection, and after he had shown to the court a document which we infer was a transcript of the testimony taken at the preliminary examination of the defendant, and which evidently contained some statement made by the witness, at such examination, the prosecuting officer objected to the statement therein contained on the ground that it "is an opinion and conclusion of the person giving it." He did not, however, object on that ground to the question asked of the witness. Therefore, the only objection interposed was that no proper foundation had been laid for the question. The question, as we have already seen, was "Did you hear the deceased make any statement at that time there, to anyone there, to show that the deceased knew he was dying?" It is clear that this was not such a question as would require the laying of any foundation before the witness could answer it. The evident purpose of asking this question was to elicit an answer which would serve as the foundation for the introduction of the dying declaration of the deceased. [4] At this time there was before the court evidence of the statements made by Farmer, immediately after being shot, which tended to show that he realized that he was mortally wounded. A further statement from him indicating that he still held to that belief, coupled with the fact which was then in evidence that his wound was fatal and that he had died from the effects thereof a few hours thereafter, would in all probability have been a sufficient foundation upon which to base evidence of the dying declaration of the deceased. The defendant was denied the right to show this statement, if any was made, by the action of the court sustaining the objection, and in our opinion this ruling was not only erroneous, but was extremely prejudicial to the rights of the defendant.

Appellant insists that it was error on the part of the court to examine the copy of the transcript of the testimony containing the testimony of the witnesses taken at the preliminary examination, while it had under consideration objections to certain questions asked of these witnesses called on behalf of the appellant. What the witnesses may have

testified to at the preliminary examination, or what they may have said elsewhere, prior to their taking the witness-stand in the case then on trial, could have no bearing upon the merits of the objections the court was then considering. [5] The ruling of the court upon these objections should be governed entirely by the nature of the questions asked, their relation to the facts in the case then on trial, and the form of the objection, and not upon what the witnesses may have testified to or stated on some previous occasion. Their previous testimony or statements could have no possible bearing upon the admissibility of their testimony in the case on trial, nor upon the court's ruling upon the objections before it. Such practice finds no authority in law or reason, and it is not to be commended. We are not prepared, however, to hold that such action on the part of the trial court would in all cases amount to reversible error, or that it had such a result in the present action. As we have already stated, the legality of the ruling of the court upon an objection to a question does not depend upon the source from which the court obtains its information, but upon the nature of the question and its applicability to the facts in the case. If the ruling of the court is proper, taken in connection with these pertinent considerations, then the fact that it received information in an unauthorized manner, or even from illegal sources, would not affect the legality of its ruling. On the other hand, if the ruling of the court is contrary to law, it would be a matter of no consequence from whence the court derived its information upon which it based its ruling. We have already held that in our opinion the court erred to the prejudice of the defendant in sustaining the objection to the question propounded to the witness Braud, upon the ground that the only objection made to this question was that no foundation had been laid, when from the nature of the question it was not necessary to lay any foundation to entitle the witness to answer it. Therefore, the action of the court in using the transcript of the testimony taken at the preliminary examination, whether authorized or not, becomes of no importance in so far as this appeal is concerned.

[6] We have examined the proposed instructions on behalf of the defendant which were refused by the court

and we discover no error in the ruling of the court upon these instructions. The subjects thereof were adequately covered by other instructions given.

For the reason that, in our opinion, the court erred ·in sustaining the objection to the question propounded to the witness Braud, the judgment is reversed and the defendant is granted a new trial.

Conrey, P. J., and Houser, J., concurred.